Thank you, Your Honor. May it please the Court, esteemed counsel for our government, let me start off by saying that this is my first time to argue before this Court, so if you hear my knees rattling or you hear me stuttering or faltering in any way, please don't hold that against my client or me. We don't bite. Thank you. We'll toughen you up in a little bit. Okay. You'll do fine. Thank you, Your Honor. Let me start off by saying that when Mr. Arrieta received relief under DACA, which stands for Deferred Action Due to Childhood Arrival Program, an executive order first enacted by former President Obama and an ongoing program that still exists under President Trump, he went from living in the shadows to living in the light. When Mr. Arrieta qualified for relief under DACA, that meant that he met all of the DACA requirements. That meant that he got here in the United States, or he arrived here when he was less than 16 years old.  That meant that he lived here continuously for five years prior to the executive order going into effect and that he was present in the United States when that order went into effect. It also meant that he knew how to comply with the laws of our country by not having committed any felonies or serious misdemeanors or repeated misdemeanors, and it also meant that he was under 30 years of age. When Mr. Arrieta received relief— He pled guilty to a crime, right? He pled guilty— He had the right to appeal on the grounds that he is here lawfully, his presence. That's exactly right, Your Honor. But let me just say that this is a crime that scienters are not required to be proven by our government. It's a crime that even though you don't intend to possess a weapon, you can still be found guilty of it. What kind of weapons did he possess? He possessed a pistol and a large amount of ammunition. There's nothing in the record that indicates that this arm— What kind of pistol was it? I want to say it was a Luger. I don't recall that specific detail, but it was an unloaded pistol that was located. Now, when he was stopped, and it was a traffic stop, he immediately offered that information to the police, saying— When he was asked, do you have anything illegal in your car, he said, no, but I want to let you know I have a pistol and ammunition. So he was forthright about that. And there's no evidence in the record that that ammunition and pistol was going to be used to be sold to the cartel or be used for any illegal reason. Otherwise he has no criminal record. He has no criminal record. Otherwise he would not have received relief under DACA. All right. And there's no evidence that he intended to use the gun, the pistol, and the ammunition for unlawful purposes. Exactly, Your Honor. There's no evidence in the record. And to the contrary, there was some evidence, some information in the PSR which indicated that the person to whom he was going to deliver that pistol and ammunition was not a person of a legal nature. He was not a criminal. It was a lawful thing that he was going to receive that pistol and ammunition. The gun was not his? It was not his. There is no evidence that it was stolen, but there is no evidence that it was an illegal transaction for him to have received that gun and transported it other than this provision that we're here for today. But there's no question that despite DACA, he was in the country illegally. Yes, Your Honor. And that's where we really get stuck on, hung up on the issue that status, whether you have illegal or legal status. But I think what the focus needs to be is not so much status because DACA doesn't change status. What it did is it changed his classification from an illegal presence to a legal presence. And it changed his authorization from being here illegally authorized to be in this country to legally authorized to be in this country. In the cases that have been cited in the briefs, et cetera, it appears, though, that status predominates over presence. So what's your best case or line of cases to a pathway in this factual circumstance that presence sort of either neutralizes the status piece or, stated differently, that status isn't the predominant focus? Well, let me give you one case that's cited in the Apolis brief is Oriana, which is a case decided by this court back in 2005. This court was really busy in 2005 and part of 2006 when it decided a series of cases under this provision. But all of those cases, Your Honor, deal with an adjustment of status situation. The people in those cases either came in for a temporary protective status because they were fleeing their country for one reason or another and seeking asylum here, which gave them the opportunity to apply for an adjustment of status either under the 145 or the 485 application. So there was a period of time between their presence here and getting that temporary period of time where they were basically not removable. There had been a stay of his deportation or removability. But that did not adjust their status in any form or fashion. Let me say that all of these cases also deal with provisions in the INS law that are couched in numerous and well-founded, well-situated statutes and code of federal regulations. And the answer to my question is? Well, the answer to your question, Your Honor, is that the case Oriana is probably more on point than any of them. This is an executive order that is not couched in statute and is not couched in a code of federal regulation. There is no guidance there. Okay? If anything, there is ambiguity as to whether or not he was lawful. The notice that I'm just looking at some of my notes here. The notice provided, Arietta, says that DACA specifically says that DACA relief does not confer or alter any immigration status. At the time he received it, his status was an unlawful immigrant. After he received it, he was an unlawful immigrant. And the statute under which he was convicted simply says that anybody who is in the United States unlawfully, who possesses weapons such as he did, has committed a crime. So, I mean, it looks like you have a real, real steep hill to climb here. Well, it may be steep, Your Honor, but I believe that it's solid ground for us because even though that status has not been altered, alteration of status is something that is statutory. Okay? It's something that is couched in statute and code of federal regulatory language. In this case, we have an executive order that did not so much in accordance to the DACA relief that he received alter his status. He became, he went from illegal to legal. And he went from unauthorized. His presence did, right? His what? His presence went from illegal to legal. His presence did. But his status did not. No, but status is not a word used in the statute. Even though all these cases cited in the briefs deal with status, immigration status. It's a term of art under the immigration code. The statute doesn't refer to status, legal status. Which status? The 922, which is the possession of the firearm statute. We're not talking about DACA. It's not a statute. That statute does not address. It's not a statute. Right. DACA is not a statute. It is an executive order. Does the record reflect whether your client ever applied for citizenship or anything like that? No, Your Honor. Not that I recall. And I do know that DACA is a stay of removal. And he comes living here legally. And let me just remind the court that he, when he was, when he received relief under DACA, as I stated previously, he went from living in the shadows to living in the light. He obtained a social security number. He was able to work legally. He obtained a Texas driver's license. He was living his life legally in a manner that he thought was legal. He didn't know he was breaking the law. And the record clearly reflects that. He didn't know that it was illegal for him to travel from Arkansas to Texas with what he had. Okay. So that brings me to the other point, is that because there's some certain ambiguity as it relates to this particular case, DACA relief, okay, then the ATF's interpretation of that statute and CFR should not be given a certain amount of weight. In fact, the rule of lenity should apply so that any ambiguity that exists should be ruled in favor of the defendant. And if he had known that it was illegal for him to travel with his ammunition and pistol, he wouldn't have done it. But you've acknowledged that knowledge or not isn't crucial. There are a lot of laws you can violate not knowing that you're doing it, but nonetheless, once done, that's done, right? You don't have to prove scienter in a situation like this. Our government doesn't have to prove that. But what is required and what's even more fundamental than having to prove scienter is due process. The statute must give notice that you're violating the law. And in a situation like this, when he's- The very title of it says possession by an illegal, doesn't it? But he wasn't illegal anymore once he received the relief. Well, his status was still that. And the court seems to want to focus on status when, in fact, really, when he got the DACA relief, it changed his classification from illegal to legal. Presence. Presence. Presence. In other words, he's still unlawfully in the country. Correct? If you look at it in terms of alteration of status, maybe so. But I believe, Your Honor, Mr. Arrieta submits that DACA gave him the relief necessary and legal presence necessary to not be prosecuted under that statute. What is it the holding you would want from this panel? A one-case holding, applying the rule of lenity to your client, separate and apart from, you know, the other cases? What's the relief you're asking specifically? You're looking for a one-case only, your client's unique circumstances relief, but not something that impacts the statutes that we're looking at? Taking the language of this court in the Oriana case, Your Honor, this court held that Mr. – that the defendant in that particular case was in a form of lawful status throughout the time that he was under – his presence in the United States is legal and he's authorized to be in this country working, contributing to society, paying taxes, all those things. When he was arrested, he was still under a two-year extension, was he not? Yes, he was under the DACA relief. And so the language of Oriana, Mr. Arrieta submits, states, is applicable here, that the language of 922 does not unambiguously indicate that his presence in the United States was unlawful. And because of the ambiguity and lack of notice that 922 gives to Mr. Arrieta in that it does not define illegal or unlawful, the ATF's interpretation of the statute and corresponding CFRs should not be given difference. So in a situation like that, because this is really a case of first impression as it applies to DACA, and because there is no specific definition, he doesn't fall within the definition of the CFR, the rule of lenity should apply. All right, I'm going to stop you at the end of that sentence. You have a red light, but you've reserved your rebuttal time. So we'll hear from the government, and you'll have time to come back up. Thank you, Your Honor. Thank you. Mr. Pardue? May it please the Court, Eric Pardue for the United States. The district court here did not err in denying Mr. Arrieta's motion to dismiss the 922 G-5 indictment because Mr. Arrieta, at the time he possessed the firearms and ammunition in this case, was illegally or unlawfully in the United States after he overstayed his B-1, B-2 visa that had expired years earlier. He concedes that all the other requirements for a 922 G-5 offense have been satisfied here. The only question that he has raised is whether or not he was illegally or unlawfully in the United States. There are three big points I want to hit. One, to build off of the Court's questions earlier, would be this Court's precedent in Flores, Arrieta, Lucio, and Aware. Second would be what exactly DACA does and, more importantly, doesn't do. And third, I want to hit on a notion that to interpret DACA to do what Mr. Arrieta asked would lead to some absurd results whenever you view it in context with the rest of Section 922 G-5. So first, Chief Justice Stewart, as you said, this Court's precedent, starting in Flores, extending through Arrieta, Lucio, and Aware, focused on the fact that what matters for purposes of being unlawfully or illegally in the United States for 922 G is whether or not you have lawful status or unlawful status. Mere presence alone is not enough. In the Flores case, this Court held that an alien can be temporarily granted a stay of removal and provided work authorization, and that is not enough to make them lawfully or legally here for 922 G purposes. Mr. Flores was, in fact, prosecuted and convicted. So I think under Flores, presence alone is not enough. Then you get to Oriana. This Court focused on the fact that temporary protected status is a change in status, and because it's a change in immigration status, then the defendant there is not subject to 922 G-5 prohibitions or G-5A prohibitions. In Lucio, that's extended. Same thing with Aware. So it's at the end of the day what this Court's precedent has held is that if an immigrant is here unlawfully, illegally, they don't have legal status, then they cannot possess a firearm under 922 G-5. For purposes of Mr. Arrieta, his receipt of deferred action under DACA does not change that. I think it's important to note that it's very clear, Judge Adelli, as you pointed out, what DACA does not do, and DACA does not change an immigrant's status. The 2012 DHS memorandum from— Judge, how do you understand Ms. Guerrero's argument that her client does not fall within the general prescriptions of illegality? So I think there's a way to conceptualize this in that there are two lines of people. You have people that are here illegally and unlawfully or have illegal and unlawful status. Those would be prohibited by 922 G-5A from possessing a firearm. You also have a line of people that have obtained legal status. Either they've been adjusted, they've been paroled in, or they have temporary protected status. If you look at all of this Court's case law, if you're in the illegal status, merely applying to get into the other line doesn't do it for purposes of 922 G.  So in Oriana, when Mr. Oriana received temporary protected status under that statutory regime within the INA, then he changed lines and could then possess a firearm. Mr. Arrieta, in only getting DACA, that does not change which line he's in. Really, it's just a deferral of action on immigration consequences based on priority. So he's still in the same unlawful and illegal line under DACA. He just maybe gets moved farther back in the line. But at no point has he been changed over to legal status and the possibility of owning a firearm. Indeed, Mr. Arrieta has never even applied, at least on the record, to change his status. So he's at a position farther back, I think, than even Mr. Flores, Mr. Lucio, and Aware, who this Court held could not possess a firearm even though they had at least tried to change their status. Here, all that has happened is the Department of Homeland Security, through the Deferred Action Program, has granted deferred action to Mr. Arrieta only to say, we are not going to prosecute you or try to remove you at this point due to the priorities of who we have to try to get out of the country first. So I think it's important to realize that DACA, by its express terms, does not change status. And indeed, the notice that Mr. Arrieta received saying that he had received deferred action states— Of course. I mean, if he had not committed this crime, he'd still be—his presence would still be lawful. I assume that the extension of his time under DACA would have not expired. But the thing that makes his presence unlawful is a conviction? Is he still lawfully in the United States? At this moment? At this moment. As far as I know, it's not in the record, but I checked into that, and I believe Mr. Arrieta was deported to Mexico after he left Bureau of Prison's custody because I just put a detainer on him the moment he was arrested because that possession of firearms— This is probably not relevant. It's kind of abstract. But the fact that he was convicted of a crime, this particular crime, does not make his presence in the United States unlawful even after he's convicted. So that gets into some intricacies of— Okay. I think I know the answer to your question is because he was an overstay of his visa, the moment he's convicted of this possession of firearms offense, he's immediately deportable, I think, without some of that. But at the end of the day, what it comes down to is at the time he possessed this firearm, he did not have lawful status. Therefore, under 922G5A, he was prohibited from— But you said status is nowhere in the statute or regulations. This is just something the government has cooked up, status, to use the term status. I believe that comes more from this court's precedent. It also makes sense that for purposes of a criminal statute like 922G5, it's important to have this notion of status as something created by statute. So either an adjustment of status through the INA, temporary protected status, or some statutory mechanism rather than just mere deferred action or a situation where the executive in trying to implement who gets removed at what point sets the priority for that. But for purposes of ascribing criminality to a legal status, I think it's important that it be based off of status and not mere presence. And this court's precedent in Flores and Lucio has held that merely having a removal state, so having some form of legal presence during the period of that state, is not sufficient for 922G purposes. So Mr. Orieta's argument, I think, would extend— basically, not necessarily specifically foreclosed by Orieta because this is a new issue, but for purposes of what illegally or unlawfully in the United States means for 922G5, this court's case law, I think, is pretty clear that it means status and not merely presence. So at the end of the day, I think it's important to note that this case is much more like Flores, much more like Lucio, and much more like El Juare than it is Orieta. To move on to my third point, which is to interpret 922G5A to also include just presence and not status could lead to some absurd results within 922G itself. So 922G5B prohibits someone that's here on a non-immigrant visa from possessing a firearm, absent some exceptions. Mr. Orieta came to the United States originally when he was two on a B1, B2 non-immigrant tourist visa. So at that point, whenever he actually had legal status to be in the United States until that visa expired, he couldn't possess a firearm then, so it would be kind of absurd to say that he can overstay that visa and then somehow— He was two years old when he came. Did he have a separate status from his parents? I'm not sure I— Well, you said he was on a tourist visa. Correct. Was there one issued to him, or was he just tagging along on his parents' tourist visa? So the record shows that he was issued his own separate B1, B2 visa. It doesn't—I have—the record doesn't indicate how his parents came across. I know there is, in his DACA application, and there's a footnote in the government's brief talking about how he mentions that he came over without inspection, which suggests it's possible that he had a visa but, say, his parents didn't and they crossed unlawfully. But I don't think that's— But at some point, he got some sort of temporary status for being here. I don't know if it's for college or what. No, Your Honor. So his visa, that B1, B2 visa expired, I want to say, after maybe a year or two, so when he was about four or five. How old is he now? He was 22 at the time of the conviction. I would assume 23 or 24 at this point. But once that tourist visa expired, he's never done anything to adjust his status since then. So the only thing that he has done is applied for deferred action under DACA, which does not confer any lawful status. It doesn't move him from the unlawful line to the lawful line. It just simply moves him further down the priority line. Let me answer this question sort of going back a bit. On the one hand, you urge, of course, that through our precedent, Laurie's and the other cases, there's Trump's. On the other hand, there's an argument somewhere in the briefs and maybe even counsel opposite argues it, that this may be, quote, a case of first impression, and maybe that's as relates to the sort of nuanced part of this. I'm not sure. So my question is, does it just track? All we're doing here is applying Arellano, Flores, et cetera, to this case. Or is there a piece of this, somewhat along the lines of what Judge Jolly asked you, this sort of floating in space piece that's not directly controlled by language in the other cases or not? You follow me? So my question is whether is it a case that just has straight-line precedent controls end of question, or even if the result is as you say, but is there a piece of this that is a matter of first impression in terms of stringing together those cases with the circumstance here? Do you follow me? I do. And I think this is a case where it's just an extenuation of those. The only way I think this is an issue of first impression is because those other cases deal with either adjustment of status or temporary status. There isn't a case specifically about DACA. If there was, then we would have probably moved for summary affirmance rather than filing a brief. But my first impression, I mean, this is just one more extension of where that case law is clearly going. And the way I think that opinion or how that rule works is that unless you have legal status, not just mere presence because mere presence was here in Flores, mere presence in a state of removal was here in Lucio. Unless you do that, then you cannot possess a weapon under 922G5. One other, to point out the weird results here, is that by accepting the idea that DACA would allow you to possess a firearm, DACA can be revoked at any moment. I can walk out of this courtroom and the Department of Homeland Security could issue new policy guidance saying that DACA is no longer the department's policy and every DACA recipient no longer has that protection. They would then be subject to immediate removal or whatever is appropriate. Is it correct that DACA benefit is issued on a case-by-case basis? Yes, Your Honor, that's the idea. And I believe, I think it's the Crane case that this court heard whenever some INS agents or ICE agents from Mississippi challenged DACA that found that DACA is a case-by-case. Does he get a card or some kind of authorization that says you are hereby declared to be a lawful presence by virtue of DACA? So they receive, I think it's in I-797, it's on page 4. But, I mean, do they receive it in their name? I mean, I guess they would have to. Well, it's just a notice saying that the Department of Homeland Security has decided to give you deferred action. But it has their name on it. It has that individual's name who's being granted the benefit. Correct. So there would have to be some sort of inspection on the part of that individual who's got to show that he is eligible for that program. Then they say you are eligible and here's your certificate, right? Correct. So it is an individual basis. It has to be, not massive. And at the end of the day, what matters is that DACA can be revoked at any moment because it's mere discretion from DHS. When you say revoked, are you talking about the program or his individual eligibility? Both, Your Honor, because since it's merely prosecutorial discretion not to remove him, the Department of Homeland Security can decide to actually exercise that discretion and start liberal proceedings at any moment for anyone that has DACA. It goes back to the whole purpose of— And they withdraw the program any time they want to. Correct. That's why I say I could leave this courtroom and there could be a new policy memorandum coming out. But the key to that is that because of that, Mr. Orieta is arguing that he can possess a firearm under DACA, but the moment that it gets revoked, he's then violating the law. Whereas if you look at status as a process, temporary protected status, there's a 60-day window of notice before the Department of Homeland Security can undesignate a country, leading someone to lose that status and move back to unlawful presence. Losing a green card, being a permanent resident, all of that there's a window there where someone who could otherwise possess a firearm would then have the opportunity to divest themselves of those firearms before being prosecuted. If he'd had a green card, he would have been here with lawful status. Correct. And a green card would be a situation where if the green card was revoked for whatever reason, there would be a period of notice to the person that they were about to lose status and could no longer possess a firearm. To read DACA as providing the ability to possess a firearm would make that a simple on and off switch that would be kind of an absurd result, in addition to how you view it between G5A and G5B. Unless the court has any further questions about the subsequent issue. No, there was a minor issue about a clerical error in terms of the statute of conviction. Correct. So Mr. Arrieta was indicted on and pled guilty to violating 922G5A. In the judgment of conviction, it unfortunately says 922G1, which is felon in possession. Mr. Arrieta had no prior criminal history, so he couldn't be a G1 conviction. The government's arguing that this court should, rather than remand to the district court, should just affirm the judgment as modified to note that clerical correction. I think this is a situation where, in this court's discretion, it makes more sense. Mr. Arrieta didn't even bring that issue up. It came up first in the government's point. So unless there are further questions, I would ask the court to affirm as modified to correct that clerical error. All right. Thank you, sir. Ms. Geer, do you have rebuttal? Yes, sir. Sort of picking up where I left off last time, with respect to how this applies to DACA, this is a case of first impression. There was no clear notice to him that he was violating the law. Just as in the Oriano case, when he was given certain benefits under TPS, including but not limited to non-removability, employment authorization, eligibility to travel abroad, lawful immigration status as a non-immigrant for purposes of adjustment of status, valid status for purposes of applying for asylum, and lawful presence for purposes of applying for Social Security Title II benefits, those are similar to what Mr. Arrieta had in this case. And so Oriana is really a case that's also TPS, just like Flores. But yet this court held in the defendant's favor in Oriana, but held against the defendant in Flores, and held against the defendant in Lucio and El Rawi, all of those dealing with adjustment of status. But Mr. Arrieta submits that really his status, as that's defined in the INS, in the INA, is really not the sole way to approach this case. You look at the statute and its plain meaning and its plain language, the issue is whether he's here unlawfully or illegally. That's not defined in the statute. When he woke up that day and decided to transport ammunition and a firearm from Arkansas to South Texas, he didn't know he was breaking the law. And again, we submit that that statute is ambiguous. Your opening statement said that Sienta isn't involved. It's not involved, Your Honor. So whether he knew or not, we can't rule on it. And that's why he pled guilty. However, what I'm saying is it was a provisional plea of guilty, and the statute is ambiguous as held by this court in Oriana. The statute did not give him notice that he was breaking the law. So even though Sienta is not required, what is required is that the statutes must get notice of their violation of the law. That's part of your lenity argument, is that right? Exactly. But, I mean, lenity, does it always go to conviction? I mean, in other words, you are not guilty by reason of lenity, or is it you're not being punished by reason of lenity? The way I understand it is that the statute is not the interpretation given by ATF is not given deference, and instead the way the statute is interpreted is interpreted in favor of the defendant, in favor of Mr. Arrietta. In other words, it would eliminate his conviction. That's his position, yes. I mean, as far as otherwise, I mean, he's supposedly down in Mexico somewhere. He's probably in the United States right now. No, he's not, Your Honor. He's been deported. I know that, but, I mean, that doesn't mean much at all. Sometimes they're deported one day and they're back in the United States the next day. Well, not in this case, Your Honor. And, in fact, it is an incentive to him given that when you have a conviction and you keep coming back, that really raises the stakes on future sentences. It really raises the amount of time you get in prison. If you commit another crime. Right. He's not coming in to commit another crime. And he's not coming in, period. He's in Mexico. He's been deported. He's in a country that he does not know. He hadn't been there since he was two years old. All right. But even if, say, if we set aside the conviction on the basis of root of lenity, that doesn't mean he's free to come back in the country. No. He's still, I mean, he's still, if he comes back in the country, he's still unlawful. He's still unlawful until he receives the relief, any other type of relief that may be available to him. And I would submit to the court that we place him in the position he was in prior to conviction, which in that situation is here under the DACA program. And if that's expired, then it would allow him to reapply. So Mr. Arianta submits that the rule of lenity should allow this court to, or require this court to narrowly interpret the statute in his favor. All right. Thank you, Ms. Carrera. Appreciate it. You acquitted yourself well. Thank you.  I look forward to seeing you all. Good job. Thank you very much. May I be excused? Yes, ma'am. We look forward to seeing you again. All right. Thank you both.